UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CIVIL ACTION NO. 13-283-HRW

MARVIN HINKEN,                                                    PLAINTIFF,

v.                          MEMORANDUM OPINION AND ORDER

SEARS ROEBUCK AND CO.,                                           DEFENDANT.

This matter is before the Court upon Defendant Sears Roebuck and Co.'s Motion for Summary Judgment [Docket No. 28]. The motion has been fully briefed by the parties [Docket Nos. 30 and 31]. For the reasons set forth herein, the Court finds the Defendant is entitled to judgment as a matter of law.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

This is a products liability case in which Plaintiff Marvin Hinken alleges he sustained damages for injuries to his leg and hand while operating his Sears Craftsman tractor mower. He further alleges that Defendant Sears Roebuck and Co. ("Sears") was negligent in its design of the lawn tractor and, as such, is liable for his injuries.

The product at issue is a Sears Craftsman tractor mower, model number 917.289240, serial number 081109A021850. It has two safety features which are relevant to this case: an Operator Presence Control ("OPC") and a Reverse Operation System ("ROS"). The OPC is an electrical system that senses the presence of the operator in the seat and shuts the engine of the tractor down if the operator leaves the seat while the blades are engaged. The ROS is an operating position on the ignition switch that allows the tractor to mow under power in reverse.

If the operator attempts to mow in reverse without the key in the ROS position, the engine will shut off. The ROS and OPC systems are separate and distinct, allowing them to work independently of one another.

In his deposition, Plaintiff testified that he purchased the mower sometime in 2010 [Deposition of Marvin Hinken, Docket No. 28-1, p. 79]. He also testified as to the accident which forms the basis of this lawsuit: On August 8, 2012, Plaintiff was mowing the front of his property using the mower. *Id.* at p. 11. He began to cut the grass around a culvert or drainage area on his property. *Id.* This culvert was approximately fifteen or sixteen feet down with slopes as high as sixty or seventy degrees. *Id.* at p. 13. Plaintiff testified that rocks moved from underneath the right front tire of the mower and it tipped from left to right. *Id.* at pp. 11-14. When this happened, Plaintiff attempted to put the mower in reverse but was unable to do so before being thrown from the mower downhill into the culvert. *Id.* at p. 11. The mower landed between Plaintiff's legs and on top of his left leg. *Id.* at pp. 11, 52. According to the Plaintiff when the mower landed, the engine did not shut off and the blades cut his left leg. *Id.* at p. 11. In order to get the mower off of him, Plaintiff reached under the mower deck with his right hand to lift the mower. *Id.* at p. 11. As the blades were still running, the blades severed off two fingers and broke and mutilated other fingers. *Id.* at p. 11. Once freed from the mower and its running blades, the Plaintiff began to crawl to the top of the culvert but lost consciousness before reaching the top of the culvert and nearby road. Fortunately, Plaintiff's dog was able to get the attention of a passing car and the driver called 911. The Plaintiff was airlifted to University of Kentucky where he received treatment for his injuries. Plaintiff's left leg had to be amputated from his knee down. He lost the baby finger on his right hand, and severely injured each finger on his right

2

hand. [Plaintiff's Complaint, Docket No. 1-1, ¶ 13].

In his deposition, Plaintiff admits that he read and understood the directions for safe operation of the tractor and the dangers associated with improper . He concedes that he disregarded the explicit safety instructions and operated the tractor near a drop-off, ditch or embankment at the time of his accident:

> Q. Do not mow near drop-offs, ditches or embankments. You were mowing near a drop-off, ditch or embankment, weren't you?
>
> A. Near, yes, sir.
>
> Q. Okay. Tells you not to do that right?
>
> A. Yes, sir.

[Deposition of Marvin Hinken, Docket No. 28-1, p. 60]

Plaintiff contends that the engine and blades did not shut off when he was thrown from the mower, because the OPC system had failed. Additionally, Plaintiff does not state long it took from the time he was thrown from the subject tractor until the blades and engine did shut down. *Id.* at p. 61.

There is no evidence in the record of problems with the mower prior to the accident. Plaintiff placed two service calls to Sears for repairs to the  mower approximately seven to eight months after the accident. [Affidavit of Michael Schwegmann, Docket No. 28-3]. Michael Schwegmann, an In-Home Service Technician for Sears, responded to both service calls and performed repair work that was requested by the Plaintiff.  Mr. Schwegmann stated that he completed the first service call on March 7, 2013, which was for a "tune up". *Id.* At the time of the first call, seven months after Plaintiff's accident, Mr. Schwegmann determined that the

3

mower, including the OPC control, was in good working condition. The only repair that Mr.

Schwegmann advised Plaintiff that the mower needed was a new blade shaft, because "it looked

as though Mr. Hinken had been running into things" and Mr. Hinken declined this repair. *Id.*

On April 18, 2013, Mr. Schwegmann responded to another service call regarding the

mower. Mr. Schwegmann was called to fix the ROS. Mr. Schwegmann observed that the

wire which runs to the ROS switch appeared to have been "cut with a sharp tool". *Id.* The OPC

was working. Plaintiff did not tell Mr. Schwegmann that the mower had been in an accident.

On August 7, 2013, Plaintiff instigated this lawsuit against Sears in Fleming Circuit

Court. Plaintiff's Complaint alleged that the mower was defective and asserted four claims

against Sears for "strict liability", "negligence", "failure to warn", and "injuries and damages".

Sears filed the instant dispositive motion as to all claims alleged. In his response, Plaintiff

conceded that summary judgment is appropriate as to the claims for strict liability, failure to warn

and "injuries and damages" but maintains that his negligence claim is not subject to summary

judgment.

Defendant argues that Plaintiff and his expert witness Clinton R. Parks, P.E., have failed

to establish that a defect existed in the mower and/or that the alleged defect was the legal cause

of Plaintiff's injuries.[1]  As such, Defendant contends that summary judgment is warranted.

## II.   STANDARD OF REVIEW

Summary judgment is warranted if the pleadings, discovery and disclosure materials and

affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled

---

[1]  Subsequent to filing its dispositive motion, Defendant filed a Motion to Exclude The
Opinion Testimony of Clinton R. Parks, P.E. [Docket No. 32].

to judgment as a matter of law." Fed.R.Civ.P. 56. To prevail, the Defendant must demonstrate that undisputed evidence forecloses the Plaintiff's claims or that the he cannot support his claims with admissible evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff must then respond with evidence showing a genuine factual dispute. Fed.R.Civ.P. 56(c)(1); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Relying on pleadings or "metaphysical doubts" will not forestall summary judgment; citing to the record is essential. *See Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).  If there is a complete failure of proof on an essential element, there is no genuine issue of material fact, and the moving party is entitled to summary judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. at 323. If a reasonable jury could not return a verdict for the nonmoving party on the basis of the evidence as construed in its favor, summary judgment should be granted to the movant. *See Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). The Court has no duty, however, to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Poss v. Morris (In re Morris)*, 260 F.3d 654, 665 (6th Cir. 2001).

## III.   ANALYSIS

### A.   Applicable Law

Under Kentucky law, "the standard for imposing liability upon manufacturers or sellers of products is whether the product is 'in a defective condition unreasonably dangerous to the user or consumer.'" *Morales v. American Honda Motor Co., Inc.*, 151 F. 3d 500, 506 (6th Cir. 1998) (*citing Montgomery Elevator Co., v. McCullough* , 676 S.W.2d 776, 780 (Ky. 1984)). A plaintiff in a Kentucky products liability action bears the burden of showing an identifiable,

unreasonably dangerous defect. *See Gray v. General Motors Corp.*, 133 F.Supp. 2d 530, 533

(E.D. Ky. 2001), *a ff'd,* 312 F.3d 240 (6th Cir. 2002). This is an essential element of Plaintiff's

*prima facie* case against Sears.  Evidence that induces mere "surmise or speculation" does not

establish a defect. *Midwestern V.W . Corp. v. Ringley*, 503 S.W.2d 745, 747 (Ky. 1973); *see also*

*Siegel v. Kentucky Farm Bureau Mut. Ins. Co.*, No. 3:08CV-00429-S, 2010 WL 3000746 (W.D.

Ky. 2010)("Kentucky common law and applicable Sixth Circuit case law are clear: [t]he finder of

fact cannot be asked to speculate, suppose, or surmise that there was a manufacturing defect.")

In addition to proving that an identifiable defect existed in the product, the Plaintiff must

also prove that the defect was the cause of his injuries. "[T]he product must be a legal

cause of the harm." *Holbrookv. Rose*, 458 S.W.2d 155, 157 (Ky. 1970); *see*

*also Huffman v. Saints Mary& Elizabeth Hosp.*, 475 S.W.2d 631 (Ky. 1972).  In order to

sufficiently establish causation, the Plaintiff must prove that the product is a "substantial factor"

in bringing about the alleged harm. *Bailey v. N . Am. Refractories Co.*, 95 S.W.3d 868, 873 (Ky.

App. 2001). Moreover, under Kentucky law, a plaintiff in a product liability action must prove

that the product is the probable cause – **not merely a possible cause** – of the Plaintiff's injury.

*Id.* (emphasis added); *see also Midwestern V.W . Corp.*, 503 S.W.2d at 747.

"Expert witnesses are generally necessary, indeed essential, in products liability cases, as

they are in medical malpractice actions, to prove such matters as a product defect and proximate

causation." *Watson v. Ford Motor Co.*, 2009 WL 5064316, *3 (E.D. Ky. Dec. 15, 2009).  *See*

*also Dailey v. Hoffman/New Yorker, Inc.*, 2011 WL 5598908, *8-9 (E.D. Ky. Nov. 17, 2011)

(finding that when a technical piece of equipment is involved, an expert is needed to explain any

design and manufacturing defects and also to testify about the probable cause of the accident or

occurrence") and *Thomas v. Manchester Tank & Equip. Corp. and Therm-O-Disc, Inc.*, 2005 WL 3673118, *3 (W.D. Ky. May 13, 2005) (finding that an expert is necessary in products liability cases because "the complex or technical matters in many products liability cases are outside the knowledge of ordinary lay people").

**B.    The Opinion of Plaintiff's Expert**

Plaintiff contends that the engine and blades did not shut off when he was thrown from the subject tractor, because the OPC system had failed. [Deposition of Marvin Hinken, Docket No. 28-1, p. 61].

Plaintiff retained a professional engineer, Clinton R. Parks, to offer an opinion as to the cause of his accident and resulting injuries.  In opposing summary judgment, Plaintiff relies upon Mr. Parks' opinion that  the wires under the right rear wheel-well had become frayed and worn due to the motion they experience every time the tractor gear stick is shifted from one position to another and the frayed wire could result in an intermittent connection which would satisfy the OPC such that the tractor operated with the blades under full power when the Plaintiff was not in the tractor's seat.

In his one page Preliminary Report, Mr. Parks indicates that, a year and a half after the accident, on March 15, 2014 he performed a visual inspection of "some wiring going to the seat switch" that Mr. Hinken claimed had been "changed" by a Sears service technician subsequent to the accident. In his report, Mr. Parks opined:

- The wiring going to the seat switch had been modified from its' original configuration.

- The shifter contacts the wiring harness in the area that has been modified as it is moved between forward and reverse.

•The original wire under the split wrap leading to the seat switch appears to have experienced a partial failure.

•An intermittent connection of the original wire **could** result in the seat safety system being temporarily being satisfied when no-one was on the seat.

• The intermittent connection "**could** account for" Mr. Hinken's claim.

• Replacement of wire with similar failures would provide a logical reason for a technician to splice in new wire, knowing a failed wire here would result in disabling the seat safety system.

[Docket No. 28 -4](emphasis added).

Following receipt of Defendant's Rule 26 report, Mr. Parks supplemented his

Report:

• The tremendous amount of force required to bend the blades and the mandrel assembly is evidence that the engine was not coasting to a stop, but rather was under power as it continued to strike Mr. Hinken's leg bone.

• The replacement of part of the wire by a trained Sears technician after the accident is evidence that the wire was damaged, because there is no logical reason to replace a good wire.

• The damaged remaining portion of the original wire of the OPC circuit is evidence of faulty wiring that was corrected by the Sears technician.

• The motion control linkage contacting and bending the OPC wire back and forth every time the mower shifted between forward and reverse is evidence of a faulty design or execution.

• If the mower did not continue to run at the time it was on Mr. Hinken's lap, then the blades would have been stopped and not capable of such damage.

• It would take approximately two to three seconds for the tractor to roll 360 degrees down the hillside and if the OPC had been working properly, the blades should have either stopped or nearly so, and would not be capable

8

of causing such damage.

- If the OPC is not capable of stopping or slowing the blades soon enough to prevent the severity of Mr. Hinken's injuries, then it is defective.

*Id.*

### C.   Analysis of Mr. Parks' Opinion

When a party's expert witness is challenged, the Court assumes the role of a gatekeeper. Its task is to ensure that the expert's testimony is both reliable and relevant. *See Burgett v. Troy-Bilt, LLC,* 2013 WL 3566355 (E.D. Ky. July 11, 2013) *citing Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993). Federal Rule of Evidence 702 guides the Court through this inquiry. Rule 702 specifies, first, that an expert must be qualified to testify through knowledge, skill, experience, training, or education. Fed.R.Evid. 702. A qualified expert may then testify so long as his opinions will aid the fact finder and are reliable, meaning they are based on sufficient data, reliable methods, and the facts of the case. Fed.R.Evid. 702(a)-(d); *see In re Scrap Metal Antitrust Litig.,* 527 F.3d 517, 529 (6th Cir.2008). A district court has "considerable leeway" in making its determination under Rule 702 and *Daubert. See Meridia Prods. Liab. Litig. v. Abbott Labs.,* 447 F.3d 861, 868 (6th Cir.2006).[2]

Plaintiff's expert, Clinton R. Parks, P.E., speculates that Plaintiff's injuries may have been caused by defective wiring going to the subject tractor's seat switch, which could have caused the engine and blades to keep turning after Plaintiff was no longer in the seat.  However,

---

[2] A hearing to decide these issues is unnecessary in this case. Under normal circumstances, a district court may resolve a *Daubert* motion without holding a hearing. A hearing is required only if the record is inadequate to decide the motion. *See Jahn v. Equine Servs., PSC,* 233 F.3d 382, 393 (6th Cir.2000). In this case, the parties fully briefed the admissibility of Mr. Parks' testimony and the record is detailed.

he fails to differentiate between the OPC and ROS systems. The OPC wiring, which was not damaged or defective, would cause the subject tractor's engine to shut down after Plaintiff fell off of the tractor and was no longer in the seat. The wiring that was repaired by the Sears service technician is the ROS wiring, not the OPC wiring. The OPC wire was intact seven months after the accident.  Indeed, it is undisputed that the OPC system was working when the subject tractor left the factory and was still working when the Sears technician fixed the severed ROS wire.  It is hardly likely, much less possible, for the OPC to stop working only on the day of the incident when it worked before and after the incident.

Furthermore, not only does Parks ignore the fact that it was the ROS wire that was cut and that it was not cut until well after the accident, but he also ignores the very testimony of the Plaintiff who stated that he never put the subject tractor into reverse at the time of accident. This fact alone renders the entire ROS wire being cut irrelevant to this case as this safety feature only engages when the operator is successfully puts the machine into reverse while the blades are engaged.

Plaintiff's expert failed to use the basic and material facts of this case to support his conclusions, including the difference between the safety systems, their wiring, their proper functionality, and their relevance to Plaintiff's account of the accident.

Further detracting from the validity of Mr. Parks' opinion is his failure to perform any testing whatsoever on the OPC in order to determine if it actually operated properly or was somehow

10

defective.  His opinion is based upon a one-time visual inspection of the mower over a year

following the accident.    In response to Defendants' argument that the lack of any testing of this

theory is fatal, Plaintiff argues that accident reconstruction of the accident in unfeasible.  The

Court is not persuaded. Parks could have easily recreated and tested the time it would have taken

for a tractor to rollover and fall down the culvert by purchasing an identical tractor and

performing his own test.  He could have also used engineering and mathematical principles to

calculate

an approximate time and rate of speed for which an object the size and weight of the subject

tractor would have taken to fall the depth of the culvert. However, Parks failed to do this and his

report never mentions any methodology, testing, or scientific calculations used to reach his

conclusion.

        Plaintiff's final attempt to survive summary judgment is based on additional speculation

by his expert regarding the actual event of the rollover. First, Plaintiff contends that the OPC

had to have been defective because in his expert's "opinion" the subject tractor would have taken

two to three seconds to roll straight down a sixteen foot drop-off and land on Mr. Hinken's leg,

and had the blades shut off in this time, Plaintiff's injuries would not have been as severe. In

regards to the timing of the rollover, Plaintiff's expert is again purely speculating. Mr.

Parks performed no testing, provided no methodology, and failed to provide any rational basis or

affirmative evidence to support his hypothesis that the subject tractor took two to three seconds

to rollover a steep drainage culvert. He simply made up a time frame to fit the run down time on

the blades without testing to ensure accuracy. Plaintiff could have easily placed a tractor on the

culvert and tested the amount of time it took for an exemplar machine to traverse the slope. This

however was not done.  Kentucky law is clear that mere allegations are insufficient to support a

claim; rather affirmative evidence is required to support Plaintiff's claim. *See Betkerur v.*

*Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).

"[I]t is incumbent on the plaintiff to introduce evidence that will support a reasonable

inference that the defect was the 'probable' cause of the accident as distinguished from a

'possible' cause among other possibilities"; otherwise, the opinion is based upon speculation or

surmise. *Gray v. General Motors Corp.*, 133 F.Supp. 2d 530, 534 (E.D. Ky. 2001), aff'd, 312

F.3d 240 (6th Cir. 2002). Yet, that is precisely what Plaintiff asks this Court to do. His expert

makes too many leaps in order  to establish his theory.  The Sixth Circuit has cautioned against

admitting opinions based upon a string of speculation:

> [the expert's] opinion contains not just one speculation but a string of them: A
> suggests by analogy the possibility of B, which might also apply to C, which, if
> we speculate about D, could eventually trigger E, so perhaps that happened
> here….the train becomes too long to pull and the couplings too weak to hold the
> cars together.

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672 (6th Cir. 2010). *See also, Midwestern V.W.*

*Corp. v. Ringley*, 503 S.W.2d 745, 747 (Ky. 1973) (expert testimony that an out-of-round brake

drum may have caused the accident by causing the car to pull right, not that it probably caused

the car accident, was insufficient to establish a defect; plaintiff must introduce evidence that will

support a reasonable inference that the defect was the "probable" cause of the accident as

distinguished from a "possible" cause among other possibilities); *and Siegel v. Kentucky Farm*

12

*Bureau Mut. Ins. Co.*, No. 3:08CV-00429-S, 2010 WL 3000746 (W.D. Ky. 2010) (expert testimony that a leak in a regulator caused an explosion and that a defect in the regulator was one of a few "possible" causes for the leak was insufficient).

Mr. Parks has suggested a scenario which hardly possible, much less probable.

## IV.   CONCLUSION

Plaintiff offers no evidence that the OPC did not work properly and exactly as designed. Plaintiff's only sources of support for his malfunction theory are his own allegations and the speculative conclusions of his expert, which is based solely on those allegations. Thus, he cannot carry his burden of proving that a defect existed or a malfunction occurred.

Accordingly, **IT IS HEREBY ORDERED** that Defendant Sears Roebuck and Co.'s Motion for Summary Judgment [Docket No. 28] be **SUSTAINED**.

Dated: 1/13/15

Signed By:
*Henry R. Wilholt, Jr.*
United States District Judge

13